UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| PAMELA GASKILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:08-CV-00308 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Pamela Gaskill appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Gaskill applied for DIB and SSI in the fall of 2004, alleging that she became disabled as of March 3, 2003, which she later amended to November 23, 2003. (Tr. 16, 94-97, 101, 374J-74L, 445.) The Commissioner denied her application initially and upon reconsideration, and Gaskill requested an administrative hearing. (Tr. 48-49, 68-71, 73-77, 374A-74I.) A hearing was

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

conducted by Administrative Law Judge (ALJ) Bryan Bernstein on May 23, 2007, at which Gaskill (who was represented by counsel), her sister, and a vocational expert ("VE") testified. (Tr. 436-73.)

Nearly a year later, on May 2, 2008, the ALJ rendered an unfavorable decision to Gaskill, concluding that she was not disabled because she could perform a significant number of jobs in the economy despite the limitations caused by her impairments. (Tr. 16-31.) The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-7.) Gaskill filed a complaint with this Court on December 18, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. GASKILL'S ARGUMENTS

Gaskill alleges four flaws with the Commissioner's final decision. Specifically, Gaskill claims that the ALJ: (1) erred at step 3 in determining whether she met or equaled a listing; (2) improperly discounted the opinion of Dr. Kepes, an examining psychologist; (3) wrongfully determined that her testimony of debilitating limitations was "not reliable"; and (4) lacked the support of substantial evidence when concluding at step five, in reliance on the VE's testimony, that she could perform a significant number of jobs in the economy. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 16-25.)

## III. FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Gaskill was forty-seven years old; had a tenth grade education; and possessed work experience as a nurse aide, imaging processor, item capture clerk,

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 473-page administrative record necessary to the decision.

and childcare provider. (Tr. 94, 98-100, 222.) Gaskill alleges that she became disabled as of November 23, 2003, due to severe bilateral knee osteoarthritis with bone-on-bone apposition, obesity, multi-level degenerative arthritis, neuropathy in the legs, chronic pain, lower extremity dysesthesias with a burning sensation, nasal polyposis and sinus problems, gastroesophageal reflux disease, major depressive disorder, borderline personality disorder, and pain disorder associated with both psychological factors and a general medical condition. (Opening Br. 2.)

### B. *Gaskill's Testimony at the Hearing*

At the hearing, Gaskill, who is six feet tall and weighed 341 pounds at the time, testified that she lives in a downstairs apartment by herself. (Tr. 448, 452.) She performs her home care independently but does so primarily from a seated position on a rolling chair; she drives a car and uses motorized carts at stores. (Tr. 452-53.) She complained of burning pain and cramping in her lower back, both knees, ankles, and thighs; numbness in her right hand; and difficulty sleeping. (Tr. 456-57.) She stated that she is depressed and often spends at least one day a week in tears because she "can't walk without pain" and "can't sit without pain." (Tr. 463.) She also stated that she has discussed gastric bypass surgery with her physicians, but that Medicaid had not yet selected her for the procedure. (Tr. 448.) Gaskill's sister also testified at the hearing, essentially corroborating Gaskill's testimony. (Tr. 463-66.)

### C. *Summary of the Relevant Medical Evidence*

On August 23, 2000, Dr. James Cates performed a psychological assessment on Gaskill at the request of vocational rehabilitation. (Tr. 365-72.) He assigned her a diagnosis of Bipolar II Disorder, Borderline Personality Disorder, and Pain Disorder associated with both psychological factors and a general medical condition, chronic, noting that she had two past

3

psychiatric hospitalizations and ongoing suicidal ideation. (Tr. 369, 371.) He rated her Global Assessment of Functioning ("GAF") score at 60, reflecting a moderate impairment.[3] (Tr. 369.)

On September 1, 2000, Dr. Oladele Olusanya, Gaskill's family physician, reported that Gaskill had severe pain in both knees, which had worsened since its onset in 1994 and was exacerbated by standing or walking. (Tr. 373-74.) He stated that the condition was expected to progress and the chances of complete pain control were not very good. (Tr. 373.) He recommended she perform a desk job rather than an occupation that required prolonged standing or walking. (Tr. 374.)

In January 2002, Gaskill visited Dr. Douglass Boss for her back, leg, and knee pain, and he prescribed medication. (Tr. 182.) She saw him again in November 2003 for a lumbar back strain. (Tr. 179.) On November 24, 2003, an x-ray of Gaskill's lumbar spine showed convex rightward curvature of the lumbar portion of the spine, grade-I degenerative-type anterolisthesis at the L4-5 level, moderate to advanced bilateral facet joint arthritic changes at the L4-5 and L5-S1 levels, and relatively mild degenerative changes at other locations. (Tr. 184.)

In 2004 and 2005, Gaskill visited the Neighborhood Health Clinic regularly for arthritic problems, chronic pain in her arms and legs, obesity, and depression; she was prescribed a variety of medications for these conditions. (Tr. 214-21, 263-68, 271, 273-84, 286.) Also in 2004 and 2005, Gaskill was treated several times at the St. Joe Hospital Orthopedic Clinic for bilateral knee pain and arthritis. (Tr. 185, 189-90, 269.) The doctor there noted that x-rays of

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

Gaskill's knees showed tricompartmental arthritis with spurring and decreased joint space. (Tr. 189-90.) He diagnosed her with bilateral knee degenerative joint disease, moderate. (Tr. 189-90.) The doctor did not find Gaskill to be a surgical candidate for knee replacements due to her young age and morbid obesity, but thought she might be a candidate for gastric bypass surgery. (Tr. 185, 269.)

On November 18, 2004, Gaskill underwent a psychological assessment by Sherwin Kepes, Ph.D., at the request of the Social Security Administration. (Tr. 222-25.) The mental status exam did not indicate significant problems with cognition or mentation, but Dr. Kepes believed that Gaskill was functioning below the average range of intelligence. (Tr. 224.) He opined that her physical condition appeared to be creating feelings of depression, manifested in the form of anhedonia, sleep difficulties, irritability, tearfulness, lack of motivation, and pessimism. (Tr. 225.) He assigned her a GAF score of 50, reflecting a serious impairment, and diagnosed her with Major Depressive Disorder, Single Episode, Moderate; and Pain Disorder Associated with a General Medical Condition, Joint.[4] (Tr. 225.)

Also in November 2004, Gaskill saw Dr. Thomas Banas, a neurologist, for complaints of hand numbness and lower extremity numbness, burning, weakness, and pain. (Tr. 232-33.) Upon evaluation, he thought that Gaskill's effort was "less than what [he] perceive[d] she [wa]s capable of upon standing." (Tr. 233.) He diagnosed her with severe leg pain and burning, knee degenerative joint disease, and obesity, commenting that she was a candidate for aggressive weight loss and conditioning. (Tr. 232-33.) That same month, Gaskill visited Dr. Michael

---

[4] A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

Holton for a physical consultative exam at the request of Social Security. (Tr. 226.)

In December 2004, Dr. J. Gaddy, a non-examining state agency physician opined that Gaskill could perform sedentary work with non-exertional limitations including occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, crawling, but never climbing ladders, ropes, or scaffolds. (Tr. 251-61.) That same month, Dr. K. Neville, a non-examining state agency psychologist, reviewed Gaskill's record and found that she did not have a severe mental impairment. (Tr. 238-50.)

In 2006 and 2007, Gaskill regularly saw Dr. Sherri Stiles-Walker for complaints of headaches, fatigue, hand numbness, chronic pain, and depression. (Tr. 289-90, 312, 320, 339, 359, 362-63.) She diagnosed her with osteoarthritis, adjusted her medications, and referred her to several specialists. (Tr. 339.)

On March 24, 2006, Gaskill saw Dr. Banas again for lower extremity pain. (Tr. 303-04.) After testing, he recommended that she aggressively pursue weight loss and stretching and strengthening exercises, and he adjusted her medications. (Tr. 304.) An EMG suggested an early sensory neuropathy and radicular asymmetry. (Tr. 289-90.)

On September 29, 2006, Gaskill saw Dr. William Couch, an orthopaedic surgeon, for her bilateral knee pain. (Tr. 346-47.) She walked with significant discomfort and used a cane. (Tr. 346.) X-rays showed severe osteoarthritis with bone-on-bone apposition. (Tr. 346.) He told her she needed bilateral knee replacements but that her age and obesity were impediments. (Tr. 346.) He recommended that she attend the weight loss clinic at Lutheran Hospital. (Tr. 346-47.)

## IV. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

7

techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On May 2, 2008, the ALJ rendered his opinion. (Tr. 16-31.) He found at step one of the five-step analysis that Gaskill had not engaged in substantial gainful activity since her alleged onset date. (Tr. 18.) At step two, the ALJ concluded that Gaskill's morbid obesity and degenerative joint disease were severe impairments. (Tr. 18-19.)

At step three, the ALJ determined that Gaskill's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 21-23.) Before proceeding to step

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

8

four, the ALJ determined that Gaskill's testimony of debilitating limitations was not reliable and that she had the following RFC:

> This individual is not able to perform work that imposes close regimentation of production. . . . The claimant would be predominantly limited to work in the sedentary posture with an option to stand occasionally. The claimant can lift as much as 20 pounds occasionally and 10 pounds frequently, but could not carry. The claimant cannot reach extreme postures (stooping, bending, etc.) more often than occasionally. The claimant cannot undertake work in hazardous conditions. Such work would include work requiring balance in the context of unprotected heights. This individual cannot work around dangerous moving machinery or around vehicles moving in close quarters.

(Tr. 23.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Gaskill was unable to perform any of her past relevant work. (Tr. 26.) The ALJ then concluded at step five that Gaskill could perform a significant number of jobs within the economy, including hand mounter (50-75 jobs), table worker (50 to 100 jobs), and loading machine feeder (100 jobs). (Tr. 27.) Therefore, Gaskill's claim for DIB and SSI was denied. (Tr. 31.)

### C. *The ALJ's Step Five Finding Is Not Supported by Substantial Evidence*

Gaskill argues on appeal that the ALJ's determination at step five is not supported by substantial evidence because the VE's testimony upon which the ALJ relied purportedly lacked an adequate foundation. For the reasons stated herein, Gaskill's argument has merit.

As stated earlier in this Opinion, a plaintiff seeking DIB bears the burden of proof at steps one through four of the ALJ's sequential five-part inquiry; the burden then shifts to the Commissioner at step five. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At this final step, the Commissioner must establish that the plaintiff's RFC allows her to engage in work found in significant numbers in the economy. 20 C.F.R. §§ 404.1560, 416.960.

9

One way the Commissioner may carry this burden is through the use of vocational expert testimony, provided that such testimony is reliable. *See Britton v. Astrue*, 521 F.3d 799, 803-04 (7th Cir. 2008); *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth."); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992).

The Seventh Circuit Court of Appeals has "recognized that the standards by which an expert's reliability is measured may be less stringent at an administrative hearing than under the Federal Rules of Evidence." *McKinnie*, 368 F.3d at 910 (citing *Donahue*, 279 F.3d at 446). "If the basis of the vocational expert's conclusions *is* questioned at the hearing . . . then the ALJ should make an inquiry (similar though not necessarily identical to that of Rule 702) to find out whether the purported expert's conclusions are reliable." *Donahue*, 279 F.3d at 446.

In that regard, "[a] vocational expert is 'free to give a bottom line,' but the data and reasoning underlying that bottom line must be 'available on demand' if the claimant challenges the foundation of the vocational expert's opinions." *McKinnie*, 368 F.3d at 911 (quoting *Donahue*, 279 F.3d at 446). "[T]he data underlying a VE's testimony must be available on demand to facilitate cross-examination and testing of the VE's reliability." *Britton*, 521 F.3d at 803. "The data and reasoning underlying a vocational expert's opinions are not 'available on demand' if the claimant must pay for them." *McKinnie*, 368 F.3d at 911 (citing *Donahue*, 279 F.3d at 446); *see also Britton*, 521 F.3d at 804 ("[D]ata underlying a VE's testimony is not available on demand if the claimant must pay the VE to produce it." (citation and internal quotation marks omitted)).

Applying this standard here, a review of the VE's testimony at the hearing makes it quite clear that the data underlying the VE's bottom line was *not* "available on demand" to Gaskill. At the hearing, Gaskill's attorney specifically requested the VE's underlying data, but to no avail:

> Atty: Okay. Now the numbers you cited for each of these jobs, and well let's just take the hand mounter, how did you reach those numbers?
>
> VE: I utilized both the city of Indiana labor Market Information Agency and the U.S. Code of Labor Department Standard Occupational Classifications for 2003 to 2005. That gave me a number for potentially more than one DOT code and for the state of Indiana and because Fort Wayne is a representative area I took the relative percentage of the state information and applied it to Fort Wayne.
>
> . . . .
>
> Atty: Okay. Now . . . how do you apportion those amongst the different DOT numbers?
>
> VE: Well, let me tell you this, I'm a professor at the university. I teach a national [INAUDIBLE] course in job analysis. From that I have every student who takes my course [INAUDIBLE] once a year where I do an actual job analysis. I also teach a course in forensic rehabilitation [INAUDIBLE] every other year and in that we look at the courses of labor market information as well as February 2007 I had a two-volume book published. It's called Advanced Issues in Forensic Rehabilitation and [INAUDIBLE] labor market information. So it's basically my call based upon those educational experiences and teaching experiences.
>
> Atty: Okay. Are you saying it's based on a labor market survey? You have a labor market survey for Fort Wayne . . . in regard to hand mounters?
>
> VE: No.
>
> Atty: Okay. And so how do labor market surveys come into it?
>
> VE: Well they will, number one, allow me to determine for the, whatever area they do, and generally it's [INAUDIBLE] area what the requirements of those jobs are and they also allow me to have probably more information about that than probably 99 percent of the practicing vocational experts.
>
> Atty: Well the information, the system method, excuse me, the method you were using you know, have you published that? Is it peer reviewed?

11

VE: Well the one that has been subject to [INAUDIBLE]. It's not particularly anything fantastic. I started doing this back in 1982 and so throughout those years I have performed other job analyses. I've also done labor market surveys. I don't have any particulars about these jobs but it does allow me to engage what jobs are out there.

Atty: Okay so, I mean so there is no peer reviewed method or you haven't published anything in regard to this method?

VE: Well, I'll have to look at the chapter in my book on it and –

Atty: Okay, that's your method?

VE: Yes.

Atty: Okay. Now could you provide that to the judge?

VE: No. He can purchase it at [INAUDIBLE].

Atty: Well that's not going to work under [S]eventh [C]ircuit case law, that's pretty - -

ALJ: Well you make your argument Counsel, just like in the last case and I'll have to consider it.

Atty: Okay. No further questions, Judge.[6]

(Tr. 470-72.)

As the Seventh Circuit Court of Appeals has emphasized, "data underlying a VE's testimony is not 'available on demand if the claimant must pay' the VE to produce it." *Britton*, 521 F.3d at 804 (citing *McKinnie*, 368 F.3d at 910-11); *see also Lawrence v. Astrue*, No. 08-3527, 2009 WL 2178670, at *5 (7th Cir. July 22, 2009) (instructing that where the plaintiff questioned the VE's reliability, "the ALJ should have required the VE to supply [the plaintiff] with the data underlying his conclusions"); *Denham v. Barnhart*, No. 05 C 3128, 2006 WL

---

[6] Several weeks after the hearing, Gaskill renewed her request for the VE's underlying data via a letter to the ALJ, but without success. (Tr. 176.)

4097284, at *3 (N.D. Ill. May 23, 2006) (remanding ALJ's decision even though the VE provided a clear and detailed explanation of how he reached his conclusions because the plaintiff was denied the data underlying the VE's reasoning). Indeed, "[a] claimant should not have to pay to substantiate expert testimony relied on by the Commissioner in seeking to meet the Step 5 burden of establishing the existence of a significant number of jobs claimant can perform." Barbara Samuels, *Social Security Disability Claims: Practice and Procedure* § 27:67. "Such evidence should be available on demand and requiring payment means the evidence is not available on demand." *Id.*

Consequently, this case will be remanded to the ALJ to conduct a new step five analysis in which Gaskill is provided with the data underlying the VE's testimony.

### D. The ALJ's Discounting of Dr. Kepes's Opinion Is Also Not Supported by Substantial Evidence

Gaskill also argues that the ALJ inappropriately discounted the GAF score assigned by Dr. Kepes, a psychologist who examined her at the request of the Social Security Administration. Dr. Kepes assigned Gaskill a GAF score of 50, reflecting a serious impairment in social or occupational functioning.

In rejecting this GAF score, the ALJ stated:

> The score given by Dr. Kepes is not persuasive. Dr. Kepes employed a 50. This score is depicted by the Diagnostic Manual as consistent with serious symptoms and exemplified by suicidal ideation, *severe* obsessional rituals, and frequent shoplifting. Notwithstanding his use of this number, Dr. Kepes found good math concentration, depression provoked by pain, independent in activities of daily living, driving alone, and mood depressed by physical problems. With such a focus upon the claimant's physical condition while measuring mental limitations, Dr. Kepes' low GAF is unsupported. Thus, his use of the scoring implies carelessness or an idiosyncratic view of the GAF numbering system.

(Tr. 25 (emphasis in original).) The ALJ's reasoning, however, fails to build an accurate and

13

logical bridge between the evidence and his result.

To explain, the ALJ's assertion that Dr. Kepes inappropriately based his low GAF score on Gaskill's physical condition is simply not supported by the record. *See generally Clifford*, 227 F.3d at 870 (cautioning that an ALJ may not substitute his own layperson's medical judgment for a physician's judgment about medical issues). In referring to Gaskill's physical condition, Dr. Kepes simply explained that it was *creating* her depression, which he ultimately rated as a serious impairment. Specifically, Dr. Kepes stated:

> Ms. Gaskill explains a physical condition that appears to be rather painful and debilitating for her. In addition to being unable to work, it is causing a reduction in many activities. *This appears to be creating feelings of depression for her.* Her depression manifests itself in the form of anhedonia, sleep difficulties, irritability, tearfulness, a lack of motivation and some pessimism.

(Tr. 225 (emphasis added).) Therefore, the ALJ's reasoning with respect to Dr. Kepes's opinion appears flawed, at least in part, and should be re-examined upon remand.[7] *See generally Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.") (collecting cases).

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this

---

[7] Because a remand is warranted on the foregoing arguments, the Court need not address Gaskill's two remaining arguments concerning the ALJ's step 3 finding and her credibility.

14

Opinion. The Clerk is directed to enter a judgment in favor of Gaskill and against the Commissioner.

SO ORDERED.

Enter for this 18th day of November, 2009.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge